**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
—————————————————————x

BRIDGET ANTONIA MCINTOSH,                    :
                                             :
                            Plaintiff,       :          20-CV-7354 (OTW)
            –against–                        :
                                             :          **OPINION & ORDER**
                                             :
KILOLO KIJAKAZI,                             :
Commissioner of Social Security,             :
                                             :
                            Defendant.       :
—————————————————————x

    **ONA T. WANG, United States Magistrate Judge:**

**I.    Introduction**

    On September 9, 2020, Plaintiff Bridget Antonia McIntosh filed this action pursuant to

42 U.S.C. § 405(g) against the Commissioner of the Social Security Administration, seeking

review of the Commissioner's denial of her application for disability insurance benefits. (ECF 1

at 1). Upon review, this Court remands to the Administrative Law Judge ("ALJ") for further

consideration. Plaintiff filed her application for disability insurance benefits on August 29, 2017,

due to depression, anxiety, and issues with her right wrist. (Administrative Record, dated May

26, 2021, ECF 18 ("R.") at 71–72, 85). Her alleged disability onset date was December 1, 2016.

(R. 14). Plaintiff's application was initially denied on January 4, 2018. (R. 14). On March 20,

2019, Plaintiff appeared with counsel for a hearing before ALJ Lynn Neugebauer. (R. 47–70). ALJ

Neugebauer issued a decision on April 3, 2019, finding that Plaintiff was not entitled to benefits

because she was not disabled as defined by the Social Security Act ("SSA"). (R. 14–26). The

Appeals Council declined to review Plaintiff's claims. (R. 1). Plaintiff filed a timely appeal to the

District Court.[1] Both Plaintiff and Defendant have cross-moved for judgment on the pleadings. This case is before me on consent of the parties, pursuant to 28 U.S.C. § 636(c). (ECF 15).

Plaintiff's request is **GRANTED**, and Defendant's request is **DENIED**. The ALJ failed to properly explain her evaluations of supportability and consistency for each of the medical sources; furthermore, she applied the wrong standards when determining the weight of the provided medical opinions. Therefore, upon review, this Court remands the case for further administrative review, including but not limited to a *de novo* hearing and a new decision.

## II.   Facts

### A.   Background

Plaintiff, Bridget A. McIntosh, born July 16, 1968, is a 53-year-old woman who worked as a phlebotomist at Montefiore Medical Group from July 2000 to December 2016. (R. 185, 187).

### i.   *Plaintiff's Physical Health*

On March 13, 2014, while Plaintiff was trying to use a soap dispenser at work, "the soap dispenser fell off the wall and hit [her] right wrist." (R. 610). That day, she went to the urgent care center at her facility and then was given a week off to recover. (R. 580). Weeks after the injury, she was still experiencing severe pain and thus established care with Dr. Louis C. Rose, an orthopedic surgeon, to treat her wrist. (Joint Stipulation, dated September 27, 2021, ECF 23 ("Stip.") at 2, R. 564). Plaintiff saw Dr. Rose on April 18, 2014. (R. 888). That same day, Plaintiff received an x-ray from Dr. Jeffrey N. Lang, showing "narrowing of the radiocarpal joints" but "no fracture or avascular necrosis" and "no lytic or blastic lesions." (R. 697). An MRI performed

---

[1] Plaintiff filed her appeal to the District Court on September 9, 2020. Appeals must be filed within sixty days (42 U.S.C. § 405(g)); accordingly, her appeal was timely.

on April 27, 2014, under the care of Dr. Daniel Lerer revealed "a small partial tear within the mid-third of the scapholunate ligament" and "a horizontally oriented partial thickness tear within the TFCC near its radial attachment." (R. 563).

Plaintiff continued to see Dr. Rose regularly through at least 2019. During that time, Dr. Rose performed four surgeries on Plaintiff: (1) September 18, 2014 (R. 702), (2) December 10, 2015 (R. 749), (3) June 8, 2017 (R. 756), and (4) October 25 or 26, 2018. (R. 965, 967). The first three were right wrist arthroscopies with synovectomy (Stip. 3, 5). The fourth was an "open carpal tunnel release with right wrist synovectomy and neurolysis of the right median nerve." (Stip. 11). The record is unclear, and the parties do not discuss, why Plaintiff underwent the second and fourth surgeries. Over the years, Plaintiff regularly worked with physical therapists to try to improve her condition (R. 860–68, 995–1021) and was still working with a physical therapist at the time of the ALJ hearing. (Stip. 12).

In January 2019, Dr. Rose "provided an opinion . . . cit[ing] diagnoses of synovitis and tenosynovitis of the right hand and forearm, articular cartilage disorder of the right wrist, and carpal tunnel syndrome of the right upper extremity." (R. 1028). Additionally, he wrote that Plaintiff was limited to occasionally lifting/carrying 0–5 pounds and said she should not engage in "prolonged lifting or carrying[,] . . . prolonged gripping or grasping objects[, or] . . . prolonged pulling or pushing." (R. 1029). Finally, he "opined that limitations had been present since August 2014." (Stip. 12).

In addition to surgery, Plaintiff also attended physical therapy at the Health First Medical and Rehabilitation Center. (R. 859, 869). From January to June 2018, she went to physical therapy weekly. (R. 860–65). In July, she went to therapy three times per week, and

continued doing so for several months, until her surgery in late October 2018. (R. 865–68, 995–1007, 965, 967). Following Plaintiff's 2018 surgery, she resumed regular sessions in December, attending three times per week at least through February 2019. (R. 1008–21).

## ii.   *Plaintiff's Mental Health*

Plaintiff has also seen several providers for mental health treatment. Plaintiff's treating physician is neuropsychiatrist Dr. Azim Etemadi, who she originally sought out "[b]ecause [she] was having nightmares and . . . kept crying." (R. 58). He first evaluated her on May 7, 2017, and has provided Plaintiff "pharmacological treatment" since July of that year. (Stip. 5–6). Plaintiff also sees professionals at Behavioral Medicine Associates for therapy; her first visit with that therapy practice was on June 15, 2016. (R. 591). Amalea Seelig, Psy.D., interviewed Plaintiff, and she and Elina Spektor, Ph.D., wrote a report, dated September 27, 2016, based on that interview and its accompanying mental status examination. (R. 570–74). Plaintiff continued seeing Dr. Seelig for psychotherapy through at least March 2018. (R. 1110). At least once, Dr. Howard Rombom, who also worked at Behavioral Medicine Associates, issued a psychological evaluation report alongside Dr. Seelig. (Stip. 10). After Dr. Seelig moved to a different location, Dr. Christine Roufail regularly treated Plaintiff, meeting with her for the first time on April 3, 2018. (R. 22, 902, 901–33).

## iii.   *Mental Health Consultative Examiners*

There have also been multiple consultative examinations of Plaintiff's mental health. Dr. Alain De La Chapelle examined Plaintiff on March 3, 2017 and on November 10, 2017, (Stip. 4, 8). Dr. "Toula Georgiou, Psy.D.[,] conducted a psychological consultative examination on October 26, 2017." (Stip. 7).

                *iv.*    *Plaintiff's Mental Health Struggles*

On September 7, 2016, Plaintiff underwent a psychological evaluation, during which she reported symptoms of anxiety and depression, such as losing interest and giving up hobbies, decreased motivation, and fatigue. (R. 570). Drs. Seelig and Spektor noted that Plaintiff "showed impairments in her concentration and short–term memory." (R. 570). Additionally, Plaintiff scored a "mild" on the Beck Hopelessness Scale, a "moderate" on the Beck Depression Inventory–II, and a "severe" on the Beck Anxiety Inventory. (R. 571). Plaintiff's responses put her above the seventieth percentile in the Beck Symptom Inventory. (R. 571). In her report, Dr. Spektor noted that "[t]he average range for cutoff is at the 50th percentile" and that "[Plaintiff's] scores are an indication of significant distress." (R. 571). At the time of the ALJ hearing, Plaintiff was seeing a psychotherapist every week. (Stip. 13). Furthermore, detailed evaluations of Plaintiff consistently noted her difficulties dealing with her depression and anxiety. *See, e.g.*, R. 785 (noting a number of tests indicating significant struggle with depression and anxiety and explaining that Plaintiff "is depressed and anxious and continues to experience significant psychological distress as a result of her chronic pain and disability"); (R. 974) (diagnosing Plaintiff with "[m]ajor depression" and concluding that Plaintiff had "a marked, partial work–related disability").

In the hearing before the ALJ, Plaintiff stressed her difficulties in coping with the realities and needs of day-to-day life. In a particularly illuminating moment, Plaintiff testified that she "stay[s] in [her bedroom] all day." (R. 60). When asked what she does while there, she said, "Sometimes I cry[,]" adding that she generally "just stare[s] at the four corners of the wall." (R. 60).

Plaintiff further testified that she was unable to go any of her several weekly doctor's appointments by herself, stating: "I go with my mom because I get panic attacks. I get really panicky." (R. 62). Plaintiff further clarified that she is unable to travel anywhere on her own. (R. 62).

### III.   Applicable Law

To be awarded disability benefits, the SSA requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ makes this determination through a five–step evaluation process, for which the burden rests on the plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step.

First, the ALJ must determine that the plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that the plaintiff's impairment is so severe that it limits their ability to perform basic work activities. Third, the ALJ must evaluate whether the plaintiff's impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 such that he may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's residual functional capacity ("RFC"), or their ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if the plaintiff's RFC allows them to meet the physical and mental demands of their prior employment. If the plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on the plaintiff's RFC, age, education, and past work

experience, that the plaintiff is capable of performing some other work that exists in the national economy.

For claims such as this one, filed on or after March 17, 2017, ALJs apply the new regulations in 20 C.F.R. §§ 404.1520c and 416.920c in lieu of applying the treating physician rule. *See Acosta Cuevas*, 2021 WL 363682, at *9 (collecting cases). Under the new regulations ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 416.920c(a). Instead, ALJs "*will articulate in [their] determination or decision how persuasive [they] find all of the medical opinions*." 20 C.F.R. § 416.920c(b) (emphasis added). ALJs must consider all medical opinions and determine their respective persuasiveness considering: supportability; consistency; relationship of the medical source to the claimant; specialization; and "other factors." 20 C.F.R. § 404.1520c(c)(1)–(5).

The supportability and consistency factors are the "most important." 20 C.F.R. § 416.920c(a). Accordingly, the regulations mandate that ALJs "*will* explain how [they] considered the supportability and consistency factors for a medical source's medical opinions." 20 C.F.R. § 416.920c(b)(2) (emphasis added); *see also Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL)(BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *R. & R. adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (remanding so that ALJ may "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and the consistency of the consulting examiners' opinions"); *Vellone v. Saul*, No. 20-CV-261 (RA)(KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("[I]n cases where the new regulations apply, an ALJ ***must*** explain his/her approach with respect to the first two factors when considering a medical opinion.") (emphasis

in original). "Supportability" is "the objective medical evidence and supporting explanations presented by a medical source." 20 C.F.R. § 404.1520c(c)(1). "Consistency" refers to how the medical source's opinions compare with "evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2). Although ALJs are only required to articulate their consideration of those two factors, ALJs must consider all five factors when determining a medical opinion's persuasiveness. 20 C.F.R. § 416.920c(c).

**IV.   The ALJ's Findings**

Here, ALJ Neugebauer applied this five-step process and determined that Plaintiff was not disabled. (R. 15). After finding that Plaintiff had not engaged in substantial gainful activity since November 30, 2016, ALJ Neugebauer concluded that Plaintiff suffers from the following moderate limitations: (1) understanding, remembering, or applying information, and (2) concentrating, persisting, or maintaining pace. (R. 18). She further concluded that Plaintiff suffers from mild limitations in (1) interacting with others, and (2) adapting or managing herself (R. 18). The ALJ then asserted that Plaintiff had "the residual functional capacity to perform light work . . . except that the claimant [Plaintiff] is limited to performing simple and routine tasks only in a quiet environment, and she can only occasionally grip, grasp, push and pull with her dominant hand." (R. 18). Finally, the ALJ determined that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 19).

V.   **Analysis**

A.   Introduction

Because the ALJ failed to address the supportability or consistency of Dr. Etemadi's

medical opinions, and it was not harmless error, remand is warranted.[2]

B.   Applicable Law

Social Security Ruling ("SSR") 85–15 states that a substantial loss of ability to meet any

of the basic mental demands of competitive, remunerative, unskilled work would justify a

finding of disability because even favorable age, education, or work experience will not offset

such a severely limited occupational base. "The basic mental demands of competitive,

remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry

out, and remember simple instructions; to respond appropriately to supervision, coworkers,

and usual work situations; and to deal with changes in a routine work setting." SSR 85–15

(emphasis added).

C.   The ALJ Failed to Properly Evaluate Dr. Etemadi's Medical Opinions.

Dr. Etemadi issued an undated "Narrative Report" (Exs. 3F, 29F) in which he noted that

based on a May 5, 2017 examination, Plaintiff was "deeply depressed and severely anxious"

and that her "attention, concentration and memory functioning are all seen to be affected by

anxiety and major depressive processes." (R. 386). Plaintiff complained of "Sleep disorder,

nightmares, symptom of anxiety and depression . . . diminished ability to think/concentrate,

---

[2] An ALJ's procedural error is not harmless where "the ALJ selectively relied on portions of the record that showed improvement without even addressing the weight of the evidence supporting the fact that [Plaintiff] continued to have serious psychiatric symptoms even after years of treatment and steadily increasing medication." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022).

very forgetful, apathy, loss of motion and social withdrawals." (R. 388). Dr. Etemadi reported

that based on his examination, "**the patient is presently totally temporary [sic] disabled**."

(R. 1087) (emphasis added).

Dr. Etemadi continued to see Plaintiff for the next three years. Each visit was reduced to

one page of "notes" that showed 85 possible check marks. (R. 1103). He consistently "checked,"

*inter alia*, that Plaintiff suffered from depression, had diminished interest, diminished ability to

think, PTSD, and anxiety disorder. (R. 1088–1103). Dr. Etemadi also noted, from the inception of

his treatment, that Plaintiff's "Social/Occupational/Vocational Functioning" was "fair." (Ex. 29).

The checkmarks did not meaningfully change throughout the course of Plaintiff's treatment.

The ALJ relied on Dr. Etemadi's finding that the Plaintiff's "social functioning was fair"

but did not address Dr. Etemadi's long and detailed report of Plaintiff's mental health, as well as

the other "checked" boxes or other notations. "The ALJ cannot both rely on some portions of

[Dr. Etemadi's] opinion while discounting other portions, without any explanation for his

reasoning." *Anderson v. Kijakazi*, No. 20–CV–06462 (JPO) (OTW), 2022 WL 938115, at *1

(S.D.N.Y. Mar. 3, 2022), *R&R adopted, sub nom. Anderson v. Comm'r of Soc. Sec.*, No. 20-CV-

6462 (JPO), 2022 WL 925070 (S.D.N.Y. Mar. 29, 2022). While the ALJ acknowledged that Dr.

Etemadi's opinions reported that Plaintiff was deeply depressed and anxious, the ALJ

determined that "her clinical examination was normal" without explaining how he reached that

conclusion. (R. 22). Specifically, the ALJ stated:

> The claimant was prescribed Klonopin and Paxil for PTSD, reactive depression and an
> anxiety disorder, and he stated that the claimant was to totally [sic] disabled (exhibit
> 3F). Given that the examination was unremarkable, I do not find Dr. Etemadi's opinion
> persuasive.

At no point in Dr. Etemadi's opinions does he state that Plaintiff's examination was "unremarkable."[3] This is a conclusory determination that fails to adequately address the supportability and consistency of the Dr. Etemadi's opinion. *See Elizabeth P. v. Comm'r of Soc. Sec.*, No. 3:20-CV-891 (CFH), 2022 WL 507367, at *13 (N.D.N.Y. Feb. 18, 2022) ("Stating that a portion of an opinion is 'speculative' without reference to that provider's records or the record as a whole does not explain the supportability or consistency of the opinion such that the Court can glean the ALJ's rationale.").

By interpreting Dr. Etemadi's opinions to mean that Plaintiff's examination was "unremarkable," the ALJ impermissibly substituted his interpretation of Dr. Etemadi's notes as a basis for rejecting it. Second guessing a source's interpretation of their own notes is not a sufficient basis for rejecting a medical opinion. *See Martin v. Colvin*, No. 13-CV-2827 (VSB) (RLE), 2014 WL 4467709, at *14 (S.D.N.Y. Sept. 10, 2014) (condemning an ALJ's interpretation of medical evidence stating that the claimant was "alert and in no acute distress" to mean that he was not in chronic pain prior to the date last insured, despite the conclusions of several of the claimant's physicians that he was in chronic pain). While an ALJ is "not required to accept any single medical opinion as dispositive on the determination of disability," he "may not arbitrarily substitute his own judgment for competent medical opinion." *Williams v. Colvin*, No. 13-CV-5431 (RLE), 2015 WL 1223789, at *8 (S.D.N.Y. Mar. 17, 2015) (internal quotation marks omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998) (citing *Francois v. Astrue*, No. 09–CV–6625, 2010 WL 2506720 (S.D.N.Y. June 21, 2010)).

---

[3] The ALJ later stated that Dr. Etemadi "consistently documented unremarkable mental status examinations **except for an anxious and depressed mood** . . . ." (R. 23) (emphasis added).

## VI.     Conclusion

Accordingly, I **GRANT** Plaintiff's motion for judgment on the pleadings and **DENY** the Commissioner's motion for judgment on the pleadings. The Clerk of Court is respectfully directed to close ECF 23.

**SO ORDERED.**

_s/ Ona T. Wang_

Dated: July 1, 2022                                      **Ona T. Wang**
     New York, New York                          United States Magistrate Judge